Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA  90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGUES GERVAT, DERIVATIVELY AND ON BEHALF OF ROCKET FUEL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> E.  RANDOLPH WOOTTON III, MONTE ZWEBEN, RICHARD FRANKEL, WILLIAM ERICSON, SUSAN L. BOSTROM, RONALD E.F. CODD, CLARK KOKICH, JOHN GARDNER, ABHINAV GUPTA, GEORGE H. JOHN, AND J. PETER BARDWICK, <br><br> Defendants, <br><br> And <br><br> ROCKET FUEL INC., <br><br> Nominal Defendant. | CASE No.: <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: <br><br> (1) BREACH OF FIDUCIARY DUTY; <br> (2) ABUSE OF CONTROL; <br> (3)GROSS MISMANAGEMENT; AND <br> (4) UNJUST ENRICHMENT <br><br> **JURY TRIAL DEMANDED** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiff Hugues Gervat ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Rocket Fuel, Inc. ("Rocket Fuel," or the "Company"), files this Verified Shareholder Derivative Complaint against defendants E. Randolph Wootton III, Monte Zweben, Richard Frankel, William Ericson, Susan L. Bostrom, Ronald E.F. Codd, Clark Kokich, John Gardner, George H. John, Abhinav Gupta, and J. Peter Bardwick (collectively, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Rocket Fuel, abuse of control, gross mismanagement, and unjust enrichment for Plaintiff's complaint against Defendants alleges the following based upon personal knowledge as to Plaintiff and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through counsel, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rocket Fuel, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action seeking to remedy wrongdoing committed by Rocket Fuel's officers and directors from September 20, 2013 through the present (the "Relevant Period"). Under Defendants' management, the Company made false and misleading material statements and omissions regarding Rocket Fuel's competitive ability to combat ad fraud with its technology. This action seeks to remedy Defendants' breach of fiduciary duties, gross mismanagement, and unjust enrichment that occurred during the Relevant Period, which has harmed Rocket Fuel.

2.      Rocket Fuel is a technology company that transforms digital media buys. Rocket Fuel's technology helps the needs of the online advertising market where volume and speed are of the essence and human analysis is unfeasible. The Company has developed artificial intelligence

("AI") and data-driven predictive modeling as well as an automated decision-making platform to buy ad spots or impressions on advertising exchanges to create portfolios of impressions to optimize its advertisers' goals such as increased sales, decreased customer acquisition costs, and heightened brand awareness. Rocket Fuel focuses on the large digital advertising market facing these challenges.

3.      Rocket Fuel's AI technology is designed to buy ad spots at a high rate and at a huge scale to enable its customers to maximize their online advertising opportunities. Rocket Fuel's media buying technology platform  gives marketers a  better return on investment ("ROI") on their marketing initiatives by providing the right person at the right time, on addressable devices online across the globe. The Company's AI system autonomously buys ad spots, or impressions, on advertising exchanges to create portfolios of impressions intended to optimize advertiser goals of increased sales and brand awareness and decreased cost per customer acquisition.

4.      Advertisers want and need to have their online content reviewed by actual humans with potential buying capacity, however, robotic traffic ("bot traffic" or "fraudulent traffic") impeded advertising exchanges where advertisers are seeking a profit from fake, nonhuman traffic. Rather than humans, bot traffic is driven by code which mimics aspects of online consumer behavior but cannot generate purchasing ability.

5.      Bot traffic dilutes the inherent value and quality of legitimate ad inventory, referred to as "inventory quality." Vivek Shah, chairman of the Interactive Advertising Bureau, interview in March 2014 for the *Wall Street Journal*  in the article "A Crisis in Online Ads: One-Third of Traffic Is Bogus" stated that the "rampant fraud" of bot traffic is a "crisis" costing online marketers billions.

6.      Defendants were either deliberately reckless in not knowing about, or completely ignored, the Company's inability to identify adequately and eliminate bot traffic in their advertising campaigns.

7.     Under Defendants' management during the Relevant Period, Rocket Fuel made false and misleading material statements and omissions regarding Rocket Fuel's competitive ability to combat ad fraud with its technology.

8.     During the Relevant Period, Defendants touted Rocket Fuel's proprietary AI and technology could filter "40 billion impressions a day" and "identify and eliminate all" ad fraud threats before serving a single ad.

9.     After explicitly declaring to the market that Rocket Fuel's technology could identify and eliminate all bot fraud traffic, Defendants undertook two public offerings.

10.     Not only did Defendants over guarantee Rocket Fuel's ability to take on ad fraud during the Relevant Period, but Defendants also underplayed the extend of the problems. After a *Financial Times* article from May 2014 was published, Defendants abandoned their strategy and backtracked that Rocket Fuel's technology "is able to identify and eliminate threats before serving a single ad" and "three layers of defense proactively block[] bad sites and pages."

11.     As a result of these misrepresentations, the Company's stock rose to a high of $71 during the Relevant Period. The IPO price for Rocket Fuel shares were $29.00 per share.  Rocket Fuel's common stock commenced trading on September 20, 2013, closing the first day at $56.10 per share.

12.     Defendants and other executives took advantage of the artificially inflated share price and sold their personally held shares in the Company's February 2014 Secondary Offering, reaping earnings of approximately $175 million, while the investing public saw the value of Company stock plummet.

13.      After the fraud was exposed, on August 6, 2014, Rocket Fuel stock price fell $7.70, or over 30%, to close at $17.05 per share. As of January 20, 2016, the stock traded at $3.00 per share.

14.     Defendants' statements are false and misleading because the Company failed to disclose that, in fact, it was not sufficiently effective at combating bot fraud, and not near the levels it claimed nor at even acceptable to its customers.  While Rocket Fuel's stock was trading

at artificially inflated levels, Defendants failed to correct these materially false and misleading statements, and the Company's true rate of effectiveness was having a materially negative impact.

15.     In light of Defendants' conduct, which has subjected the Company and them to being named as defendants in a federal securities fraud class action lawsuit filed in this Court, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

16.     The Company has been substantially damaged as a result of the Defendants' knowing breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

17.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and all of the Defendants and the Company are each citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     The Court has personal jurisdiction over each Defendant and the Company because each Defendant and the Company is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants and the Company have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

20.     Plaintiff is a current shareholder of Rocket Fuel. Plaintiff has been a shareholder of Rocket Fuel common stock at all relevant times, and has continuously held Rocket Fuel common stock at all relevant times. Plaintiff is a citizen of Florida.

21.     Nominal Defendant Rocket Fuel is a Delaware Corporation headquartered in Redwood City, CA. Rocket Fuel is a technology company that used AI to provide advertising solutions to change digital media buys into self-optimizing engines adapting in real time to

Verified Shareholder Derivative Complaint

exceed advertising goals from awareness to sales. Rocket Fuel's common stock is registered on the NASDAQ Stock Market ("NASDAQ") under ticker "FUEL."

22.     Defendant E. Randolph (Randy) Wootton III ("Wootton") became Rocket Fuel's Chief Executive Officer ("CEO") in October 2015. Prior to becoming CEO, since March 2015 Wootton served as Rocket Fuel's Chief Revenue Officer for North America. Defendant Wootton is a Board member. Upon information and belief, Defendant Wootton is a citizen of California.

23.     Defendant Monte Zweben ("Zweben") serves as Executive Chairman of the Board since November 2015. Between March 2015 and October 2015, Defendant Zweben served as interim CEO. In the Secondary Offering, Zweben sold 12,996 shares of personally held Company stock for $757,081.  Upon information and belief, Defendant Zweben is a citizen of California.

24.     Defendant Richard Frankel ("Frankel") is co-founder and was President of Rocket Fuel between May 2008 and October 16, 2015. He remains an employee of Rocket Fuel in the role of Executive Vice President. Defendant Frankel served as Chief Financial Officer ("CFO") between March 2008 and February 2009.  He is and has been a member of the Board since March 2008.  Frankel sold 254,323 shares during the Secondary Offering at artificially inflated prices for approximately $14.8 million. Upon information and belief, Defendant Frankel is a citizen of California.

25.     Defendant William Ericson ("Ericson") has been a director of Rocket Fuel since May 2008 and serves on the compensation and nominating and governance committee. Defendant Ericson is managing partner at Mohr Davidow Ventures LP ("MDV"), a venture capital firm. Ericson beneficially owns 9,310,756 shares, or 22.09% of the Company's outstanding stock, of which MDV beneficially owns 9,295,955 shares, or 22.05%.  During the Secondary Offering, MDV sold 1,656,776 shares of stock for proceeds of $101,063,336.  Upon information and belief, Defendant Ericson is a citizen of California.

26.     Defendant Susan L. Bostrom ("Bostrom") has been a director of the Company since February 2013 and is a member of the Board's compensation committee.  Upon information and belief, Defendant Bostrom is a citizen of California.

27.     Defendant Ronald E. F. Codd ("Codd") has been a member of the Board since February 2012 and serves as a member on the audit and nominating and governance committee. Upon information and belief, Defendant Codd is a citizen of California.

28.     Defendant Clark Kokich ("Kokich") has been a director of Rocket Fuel since April 2011 and is a member of the audit and nominating and governance committee. Upon information and belief, Defendant Kokich is a citizen of Washington.

29.     Defendant John Gardner ("Gardner") has been a director of Rocket Fuel since July 2011 and serves as a member of the audit committee.  Gardner sold 407,693 shares of Company stock for $23,750,155 in proceeds in the Secondary Offering.  Defendant Gardner is a partner at Nokia Growth Partners.  Upon information and belief, Defendant Gardner is a citizen of California.

30.     Defendant George H. John ("John") is a co-founder of Rocket Fuel and was the Company's CEO from May 2008 to March 2015 and Chairman of the Board from February 2013 to November 2015. During the Relevant Period, defendant John signed all public filings, including documents in connection with the IPO and Secondary Offerings and the annual report for 2014.   Defendant John sold 307,877 shares of stock for proceeds of $17,935,374 in the Secondary Offering.  Upon information and belief, Defendant John is a citizen of California.

31.     Defendant Abhinav Gupta ("Gupta") is a co-founder of Rocket Fuel and served as its Vice President of Engineering until November 2014 when he began his role as company-wide strategic adviser. Defendant Gupta sold 186,855 shares of Company stock for proceeds of $10,885,238 in the Secondary Offering. Upon information and belief, Defendant Gupta is a citizen of California.

32.     Defendant J. Peter Bardwick ("Bardwick") served as the Company's CFO from September 2011 to September 2014. Defendant Bardwick sold 17,500 shares of personal stock for earnings $1,019,462.50 in the Secondary Offering. Upon information and belief, Defendant Barwick is a citizen of California.

33.     Defendants Wootton, Zweben, Frankel, Ericson, Bostrom, Codd, Kokich, Gardner, John, Gupta, and Bardwick are herein referred to as "Defendants."

34.    As the date of the last Proxy Statement issued by the Company in April 2015, Defendants beneficially owned 18,122,697 shares, or 42.76% of the Company's outstanding stock.

## DEFENDANTS' DUTIES

35.    By reason of their positions as officers, directors and/or fiduciaries of Rocket Fuel and because of their ability to control the business and corporate affairs of the Company, Defendants owed Rocket Fuel and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rocket Fuel in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Rocket Fuel and its investors.

36.    Each director and officer of the Company owes to Rocket Fuel and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the Company and in the use and preservation of its property and assets. As directors of a public company, Defendants had the duty to disseminate accurate and truthful information regarding Rocket Fuel's operations, finances, financial condition, as well as its present and future business prospects, so that the market price of Rocket Fuel's stock would be based on truthful and accurate information.

37.    Defendants, because of their positions of control and authority as directors and/or officers of Rocket Fuel, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.    To discharge their duties, the officers and directors of Rocket Fuel were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company. By virtue of such duties, the Company's officers and directors were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)      remain informed as to how Rocket Fuel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)      ensure that Rocket Fuel was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

39.      Defendants, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Rocket Fuel, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of Defendants has been ratified by Defendants who collectively comprised Rocket Fuel's Board at all relevant times.

40.     As executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information, had a duty to correct such dissemination of inaccurate and untruthful information, and had a duty not to use their knowledge of material non-public information in order to earn personal profit through insider sales.   Accordingly, Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

41.     Each of Defendants further owed to Rocket Fuel and the shareholders the duty of loyalty requiring that each favor Rocket Fuel's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

42.     At all times relevant hereto, Defendants were agents of each other and were at all times acting within the course and scope of such agency.

## DEFENDANTS' MISCONDUCT AND MATERIALLY FALSE AND MISLEADING STATEMENTS

43.     Most companies purchase online advertising by using digital buying groups to negotiate price for ad space and to develop platforms for buying and distributing digital media to consumers.

44.     On the whole, advertisement space is sold through  what is called an "advertising exchange."

45.     Purchasing digital advertising is done by "programmatic" ad buying in which software is used to purchase the ad space.  Programmatic buying makes the ad buying system more efficient, and therefore cheaper, by removing humans from the process wherever possible. This system is bidding  for ad space through real-time auctions.

46.      Rocket Fuel's technology allows for ads to be bought in bulk and at high speeds.

47.     Bot traffic generates fake page view impressions which generates advertising revenue for website owners, but interferes with a advertisers' ability to place ad on sites to be seen by a human audience.

48.     The legitimate ad industry itself depends on bot-like technology, but  Robots are buying ads generated by other robots visiting sites, and in turn, the buying bots are unable to distinguish between the fake bot traffic and legitimate human traffic. If fraudulent bot traffic goes undetected, advertisers pay a material portion of their campaign dollars to aid fraudsters that deliver fake ad impressions not viewed by humans.

49.     Rocket Fuel claims that it detects and eliminates purchases of bad inventory for its customers and that it regularly discard up to 40% all inventory.  In order for that to be possible, however, Rocket Fuel would have to screen around 500 billion ad impressions a month to achieve its revenue and growth guidance reflected in public filings. In truth, Rocket Fuel cannot achieve filtering rates at that volume. Yet, the Company depends on that volume to generate the revenue it promised investors.

50.     During the Relevant Period, Rocket Fuel regularly represented that its proprietary technology distinguished itself from its competitors that also identified and eliminated bot traffic. The Company represented:

> [W]e're proud to announce the details on how our Real-Time Brand Safety Shield provides **the highest levels of brand assurance** to our clients.
>
> At Rocket Fuel we take a proactive approach, with three layers of defense that block bad sites and pages **before we ever serve a single ad on them**. By building additional levels of safety and security right into our platform and processes, we ensure our technology delivers both ROI [return on investment] and **peace of mind for brands**.

(Emphasis added).

51.     Understanding the importance of fraudulent traffic detection, in Rocket Fuel's IPO documents, including the Prospectus filed with the SEC on September 20, 2013 (the "2013 Prospectus"), the "risk disclosures" stated that:

If we fail to detect fraud or serve our advertisers' advertisements on undesirable websites, our reputation will suffer, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations.

52.     Upon the filing of the 2013 Prospectus, Defendants knew that this was already happening, and not a potential risk. An accurate risk disclosure would have warned investors that "when" and "as" the Company failed to detect fraud, the Company's business and financial condition would continue to worsen.

53.     The IPO documents failed to state that Rocket Fuel had any concern with advertising fraud or its ability to combat the fraud,  but instead stated that Rocket Fuel used "proprietary technology to detect click fraud and block inventory that we know or suspect to be fraudulent, including 'tool bar' inventory, which is inventory that appears within an application…" The 2013 Prospectus failed to disclose that the effects of "bot traffic" was already negatively impacting the Company. It was not until after August 14, 2014, that Defendants finally specifically warned investors for the first time about "bot traffic" in its SEC filings. To the contrary, on or about June 25, 2014, the Company assured investors that the Company could "block bad sites and pages before we ever serve a single ad on them."

54.     The 2013 Prospectus also misrepresented that the Company's "real-time optimization engine delivers digital advertising campaigns that are effective and efficient" and that by "[l]everaging the massive amounts of inventory available through real-time advertising exchanges, our solution enables advertisers to efficiently connect with large audience while it maintains a focus on results-driven optimization."

55.     On September 20, 2013, the day Rocket Fuel's common stock began trading, the share price rocketed starting at $29.00 per share to close at $56.10, following a roadshow during in which Defendants represented that the Company's technology would "block bad sites and pages before we ever serve a single ad on them."

56.     In November 2013 and throughout the Relevant Period, Rocket Fuel stated on its website that its "powerful Advertising That Learns® technology uses real-time data points to recognize these bad actors and block them at the source," while continuing to tout that it was

"able to identify and eliminate all threats before serving a single ad." Defendants, knowing that ad fraud was prevalent,  nonetheless reassured investors that unlike companies who could not handle ad fraud, Rocket Fuel was uniquely suited to do so.

57.     On November 7, 2013, Defendants caused the Company to issue a press release entitled "Rocket Fuel Reports Record Revenue in Third Quarter 2013." The press release was also filed with the SEC on Form 8-K, stating in relevant part: "Rocket Fuel continued its strong growth during the third quarter, as revenue grew 132% to $62.5 million."

58.     On November 13, 2013, Rocket Fuel filed its Form 10-Q for the third quarter ending September 30, 2013 (the "3Q13 10-Q"). The 3Q13 10-Q publicized its "strong growth" and "record revenue." Following these statements, the stock price rose from $51.01 per share on November 13 to close at $54.89 on November 14, 2013.

59.     Based on the Company's representations, Evercore Group LLC ("Evercore") predicted customers growing from 840 this year to 5,000 by 2018. Piper Jaffray analysts chose Rocket Fuel as the "best play" in "algorithmically purchased advertising."

60.     Continuing to cause Rocket Fuel is represent its technology was different from other ad tech companies, at the NASDAQ OMX Investors Program on December 4, 2013, Defendant Bardwick exclaimed:

> We are looking today at 38 billion impressions a day, opportunities to buy impressions. Typically, the first step is we filter those. ***We're very good about -- we have proprietary technology about filtering for bots. We also filter for quality***. Obviously, we work with big-name advertisers who are very concerned about the quality of where their advertising goes.

(Emphasis added).

61.     During the same event, in responding to the question "How big a problem are bots in your industry? Are you able to quantify that? I mean, how do you convince your advertisers that your product solution," Defendant Bardwick explained, "[i]t's a problem," but that the Company had "proprietary technology" that "filter[ed] out bots." Bardwick further stated that, though it is a "bit of a cat-and-mouse game," he believed "the advertisers and then certain players

*like us will continue to stay ahead* of the people who are trying to make a quick buck." (Emphasis added).

62.     On January 22, 2014, Rocket Fuel announced its Preliminary Fourth Quarter 2013 Financial Results and Initial 2014 Guidance. Rocket Fuel set forth aggressive guidance: revenue for the first quarter from $73 to $76 million; and revenue from $420 to $435 million for the fiscal year 2014.

63.     Rocket Fuel's common stock continued to trade at artificially overvalued levels after guidance was announced. The Company's revenue guidance was intended to inflate and maintain the high stock price so that Company insiders could sell $175 million of privately held stock in the Secondary Offering that was also announced on January 22, 2014.

64.     On January 27, 2014, Defendants caused Rocket Fuel to file a Registration Statement on Form S-1/A with the SEC relating to its proposed Secondary Offering. The Secondary Offering documents omitted any reference to: (i) the challenges faced by Rocket Fuel; (ii) the true risk and impact of digital ad fraud and bot traffic on its operations and financial performance; and (iii) the Company's loss of customers. Company insiders and stockholders accrued approximately $175 million from the sale of 3 million shares of personally held stock. The aggregate net proceeds received by the Company from the Secondary Offering totaled approximately $115.4 million, after deducting underwriters' discounts and commissions and offering expenses.

65.     The public was unaware that Rocket Fuel was having issues with inventory quality. Credit Suisse published an analyst report on February 6, 2014 stating in relevant part: "Rocket Fuel is still the same company as it was last week. . . .  Our long-term thesis remains unchanged – FUEL is positioned to continue to gain share in a secular growth segment [ ] within online marketing. . . ."

66.     Evercore had concerns that that Rocket Fuel's "industry-high take-rate will begin to be questioned by advertisers." Evercore maintained that it could be "underestimating [Rocket Fuel's] value proposition to agencies and advertisers."

67.   Piper Jaffray published an analyst report on February 6, 2014 as well stating that the only risks seen for the Company's price target included "competition, stalled shift to RTB platforms for display, and inability of Rocket Fuel to successfully purchase media on open markets."

68.   The Secondary Offering documents provided for a 180-day lock-up agreement which precluded directors, executive officers and other insiders from offering or selling their common stock "without the permission of the representatives of the underwriters for 180 days from the date of the initial public offering." The lock-up agreement was supposed to end March 18, 2014. However by January 27, 2014, Company insiders sought and obtained a release from the lock-up arrangement. Thus, the Company was able to announce the Secondary Offering on January 27, 2014. From January 27, 2014 to March 18, 2014, Rocket Fuel's shares fell almost 20%, generating a $35 million profit for Company insiders.

69.   Many of the Defendants and other Company executives took advantage of the early release to sell their personally held stock. For instance, Defendant Frankel sold over 250,000 shares for almost $15 million, Defendant John sold over 300,000 shares for proceeds of over $17 million, Defendant Gupta sold over 186,000 shares for almost $11 million, Defendant Bardwick sold 17,500 shares for over $1 million, Defendant Gardner sold 407,693 shares for $23,750,155, Defendant Zweben sold 12,996 shares for $757,081, and Defendant Ericson sold 1,656,776 shares of stock for $101,063,336.

70.   When these stock sales occurred, Defendants were either aware or deliberately reckless in not knowing that the Company's issues with customer sales and inventory quality was negatively impacting Rocket Fuel's financial performance.

71.   Soon after the Secondary Offering, in February 2014, the newly appointed chair of the Interactive Advertising Bureau, Vivek Shah noted that fraud traffic had reached "crisis proportions" in what had been "a dirty secret" the industry had been willing to keep. Taking aim at digital media buyers, like Rocket Fuel, Shah declared that, with regard to traffic fraud, "[T]he online ad world has been too quick to blame rogue bot operators and shady publishers for all the

bogus traffic flowing on the Web." Calling out ad buyers, "We need to stop the devaluing of digital media. . . . The buyers are willing to be defrauded because it looks good on paper."

72.     On February 20, 2014, Rocket Fuel announced its fourth quarter 2013 results. Rocket Fuel also reiterated the same first quarter and full year of 2014 outlook it previously announced on January 22, 2014. In the same press release, Defendant Bardwick once again emphasized "robust revenue growth" and further predicted a strong trajectory for 2014 based on continued focus on Rocket Fuel's operational efficiency.

73.     On a conference call with analysts on February 20, 2014, Defendant John represented that "AI and big data platform is a competitive advantage enabling us to transform advertising and gain market share." Defendant Bardwick further reiterated Rocket Fuel's 2014 financial guidance on the call.

74.     On February 20, 2014, Defendants caused the Company to file its annual report for the year ending December 31, 2013 on Form 10-K with the SEC (the "2013 10-K"). The 2013 10-K was signed by Defendants John and Bardwick and included the same materially misleading risk disclosure, "[i]f we fail to make the right investment decisions in our offerings and technology platform, we may not attract and retain advertisers and advertising agencies and our revenue and results of operations may decline."

75.     The investing public continued to believe Rocket Fuel's statements. According to a March 3, 2014 BMO Capital Markets analyst report:

> Rocket Fuel will keep investing its high take-rate into technology R&D in order to maintain superior ROI performance and revenue growth. **Management has one of the highest degrees of confidence in its technology advantage that we've encountered in the ad tech space, and Rocket Fuel's track record backs this up**. The continued focus on artificial intelligence remains unique among all vendors we've encountered and management believes this removes more human decision making versus other demand-side platforms. The company then reinvests this superior performance in both R&D and sales/support services for its clients.

(Emphasis added).

76.     Defendant Bardwick reaffirmed the Company's guidance for the first quarter and full year 2014 on March 11, 2014 at a media and technology conference. Discussing Rocket Fuel's proprietary technology, Bardwick stated "very proud of the fact that we invest significantly

16

in bot-filtering technology." Bardwick further stated that the Company has "*a lot of proprietary technology that we have implemented. We actually filter initially about a third of the 40 billion impressions a day that we see*. Some of it is bot; some of it is brand-related. But over time, I think that that kind of traffic will become a lesser issue because advertisers are getting smarter." (Emphasis added).

77.     In response to a question at the conference about why companies switch to Rocket Fuel, Defendant Bardwick said:

> It's because they put $1 million into the Rocket Fuel box, and they sell more goods and services for that $1 million. . . . *We have 40 billion opportunities to buy ad impressions a day. We actually value each one of those and determine what we want--if we want to bid on*--The machines determine . . . what we want to bid on them, and then the machines learn. . . .

(Emphasis added).

78.     On April 25, 2014, Rocket Fuel stock closed at an all-time low of $31.04. That day, an article, Rocket Fuel Stock Hits All-Time Low in Wake of Insider Trades," was published online at *AdExchanger*. The article stated in relevant part:

> Rocket Fuel's stock closed at $31.04 Friday, near its lowest point since the ad tech company went public six months ago. The sell-off comes after a group of more than seven investors and senior
> executives cashed out to the tune of more than $150 million, as reported by InsiderTradingWire. Those transactions, which earned more than $14 million each for the company's top two executives, CEO George John and President Richard Frankel, took place between February 3 and February 7.
> * * *
> Wall Street can get jittery when insiders sell large stock volumes, although in Rocket Fuel's particular case it's not clear whether the stock's latest tumble is due to more insiders dumping smaller volumes of equity or (worse for Rocket Fuel) external investor fears that the insider trades signal *a lack of faith from senior management*.

(Emphasis added).

79.     On May 8, 2014, Defendants caused Rocket Fuel to announce its financial results for the first quarter ended March 31, 2014. The Company reported a higher loss than Wall Street consensus estimates, at $0.18 per share, and revenues of $74.4 million, instead of $76.2 million.

Revenues were below Wall Street estimates but in line with Rocket Fuel's guidance from January 22, 2014 and February 20, 2014. The Company changed its outlook for the second quarter 2014, lowering its forecast to $88 to $92 million for revenue instead of $101.8 million.  However, it maintained its previous guidance of $420 to $435 in revenue for fiscal year 2014.

80.     On May 8, 2014, Defendants caused Rocket Fuel to hold a conference call to discuss the first quarter of 2014 earnings. On this call, Defendant John stated in relevant part: "Our artificial intelligence technology platform continues to drive superior results for our customers and produces leading margins for our business."

81.     On the same call, Defendant Bardwick reaffirmed Rocket Fuel's guidance for 2014. The Company attributed its lower-than-expected second quarter revenue guidance, in part, to competitive pressures, including customers moving towards in-house advertising solutions, and competition with advertising agencies with internal trading desks. At no point did Defendants indicate the true extent to which lower customer sales were due to the Company's inventory quality or inability to detect and block ad fraud.

82.     Defendants were either aware or deliberately reckless in not knowing that: (i)  the Company was not sufficiently effective at combating bot fraud at the levels it claimed nor even at levels acceptable to its customers; (ii) the Company was encountering difficulties with inventory quality; (iii) its inability to combat ad fraud was adversely impacting its sales; and (iv) many clients and advertisers were beginning to create in-house services. All of the above were negatively impacting the Company's bottom line.

83.     On May 9, 2014, Rocket Fuel shares fell an additional 21%, from $27.81 to $21.83.  As a result, Goldman Sachs downgraded Rocket Fuel from "buy" to "neutral," cutting its price target from $69 to $25 and citing reduction in customer spending.

84.     Nonetheless, at the May 14, 2014 SunTrust Robinson Humphrey Internet & Digital Media Conference, Defendant Bardwick continued to state that Rocket Fuel was distinguished from its competitors in their efforts related to online advertising fraud saying that Rocket Fuel's technology was "the best . . . in the industry around filtering the impressions that we buy on behalf of advertisers," further stating that "we have said publically that of the 40

billion impressions we see per day -- and that number is growing very quickly by the way -- we filter about a third of them off the top for quality reasons, which would include potentially fraud-related reasons."

85.     When asked about Rocket Fuel's falling stock price, Defendant Bardwick stated in relevant part:

> And this feels like -- you know there are companies that are doing extremely well. I wouldn't say we're one of the. We've been hit pretty hard. ***So it's pretty hard for me to understand what's got to do with Rocket Fuel and what's got to do with the market as a whole***.
>
> * * *
>
> Absolutely. You know things are easy when they're easy, right? The foundation of the Company is providing long-term value to advertisers, which will provide longterm value to investors. None of that has changed. The stock price reflects the market today. ***Over time it will reflect what I believe will be our continuing very high growth rates, our continuing ability to satisfy advertisers in a way that others can't***. And that will work out over time. So when one  goes public, you think it's for the long term. And on weeks like this you just make sure that the employees know that, communicate that clearly to investors. And most importantly you keep advertisers happy, you keep your customers happy, a things work out.

(Emphasis added).

86.     On May 15, 2014, Defendants caused the Company to file a Quarterly Report for the first quarter of 2014 on Form 10-Q with the SEC (the "1Q14 10-Q"). The 1Q14 10-Q was signed by Bardwick and included the same materially misleading "risk disclosure" statements as previously included in other the SEC filings.

87.     On May 26, 2014 the *Financial Times* published an article entitled, "Mercedes online ads viewed more by fraudster robots than humans." The article on provided glimpse into the Company's ability to combat bot fraud.  The article stated:

> Part of a recent Mercedes-Benz online advertising campaign was viewed more often by automated computer programmes than by human beings, according to documents seen by the Financial Times.
>
> The ads were inadvertently placed on to fraudulent websites by Rocket Fuel, a Nasdaq-listed ad technology company that went public last September with a market capitalisation of nearly $1bn.

*The incident will intensify concerns about the prevalence of fraud in the fast-growing online advertising market,* which expanded 15 per cent last year to $120bn.

In Mercedes-Benz's case, the suspicious traffic was discovered in an investigation for the German carmaker by Telemetry, a UK company that specialises in detecting ad fraud.

In a sample of 365,000 ad impressions brokered by Rocket Fuel over three weeks, Telemetry found that *57 per cent were "viewed" by automated computer programs rather than real people.*

Mercedes said that over the whole of its campaign, the proportion of questionable impressions was less than 6 per cent, and that *Rocket Fuel "refunded us for the suspect impressions".* The carmaker added that it and its US advertising agency, Merkley & Partners, which is part of Omnicom Group, have continued to work with Rocket Fuel.

There is no suggestion that Rocket Fuel, which acts as an intermediary between advertisers and online publishers, was aware that it was delivering its client's ads to fraudsters. The company buys ad inventory via ad exchanges, which are in turn plugged in to thousands of publishers.

*However the findings raise questions about Rocket Fuel's assertions on its website that it "makes sure the 'bad actors' always leave empty-handed".*
Rocket Fuel played down Telemetry's report, saying it was not sure that the figures were "100 per cent correct". It said the findings came from a small sample and did not represent the type of traffic that normally passes through its systems.

To identify and block suspicious activity, Rocket Fuel uses a combination of its own technology and partnerships with third parties such as Double Verify and Integral Ad Science.

Rocket Fuel said that in February, it identified and rejected 500bn bid requests from online publishers because of inventory quality concerns.

Fraudsters are coming up with increasingly sophisticated ways to deceive online advertisers, using software that mimics the behaviour of a real person browsing the web.

Telemetry detected the bots by identifying anomalies in traffic to the ads. Virtually all of the suspect traffic came from five small internet service providers. And the computers "viewing" the ads used Linux, an operating system rarely used on desktops, though they attempted to disguise this by simulating popular web browsers that only work on Windows or Macs.

> Telemetry said it had traced the ownership of the bot network to two people in the UK, who directed the bots to websites they owned, thereby making money from the ad sales. The websites have since disappeared.

(Emphasis added).

88.     Rocket Fuel responded critically to the *Financial Times* report, on May 27, 2014, describing it as "sensational headlines on top of non-news." The Company reported it was able to "make good" the swath of fraudulent impressions detected by repaying Mercedes.

89.     Telemetry responded to Rocket Fuel's defense, stating that Rocket Fuel was unable to identify fraud in its media campaigns:

> If an ad tech platform such as Rocket Fuel were unable to detect the fraudulent impressions before we identified them ***then what does that mean for campaigns that sit outside the sample that Telemetry analyzed***?
>
> * * *
>
> For clarity, there is no suggestion that Rocket Fuel sold fraudulent impressions willingly or knowingly ***but what our investigations continue to highlight is the extent to which ad tech platforms themselves claim to be 'brand safe' and immune to the articulate and unrelenting vehicles and instruments of online advertising fraud.*** To what extent are they actually able to detect and therefore protect against this and how they can best help advertisers.

(Emphasis added).

90.     The Raymond James Internet/Software Crossover Conference was held on May 28, 2014. At this conference, Defendants continued to tout the Company's ability without reference to the Telemetry Report and its findings. Defendant Bardwick represented, "We've gotten bigger, and again, we're guiding to $420 million to $435 million for this year."  He also stated that the Company was "remarkably good at managing large amounts of data and then utilizing that to create ROI, it's a real advantage for us."

91.     In a July 2, 2014 interview with *Bloomberg News*, Defendant John discussed Rocket Fuel's bot-catching ability with *Bloomberg News'* Cory Johnson. During this interview, Defendant John stated in relevant part:

> JOHNSON: What percentage of -- speaking of testing, what percentage of your ads do you think are viewed by bots?

JOHN: So **we've done studies internally**. We have a science team that's sort of our bot squad that tries to figure out what traffic is real and what's not. For viewers, if you're a publisher, you may be kind of motivated to artificially inflate your traffic on your website to drive more money. And if advertisers and their parents aren't smart enough, they'll accidentally buy some of this bot traffic thinking it's real people. So with Rocket Fuel we throw away –

JOHNSON: Or they do it intentionally.

JOHN: Well, maybe. And **so at Rocket Fuel we throw over 40 percent of the opportunities we have to bid on ad space. We just throw it away because they don't pass our quality filters where**

**either we think it's a bot or - or unsafe inventory, not a good website that a quality brand would want to see their ad on.** So it's pretty massive the amount of kind of stuff out there that you wouldn't really want to run a quality brand's ad on.

(Emphasis added).

92.    On June 17, 2014, Rocket Fuel received a letter from the SEC relating to the submission of its Form 10-K. The SEC letter inquired about the consequences of delivering advertising spots or impressions that did not comply with campaign standards specified by customers.  Defendants caused Rocket Fuel to respond on July 1, 2014, stating in relevant part:

[T]he Company will have failed to deliver according to the terms of the IO [insertion order]. The form IO includes remedies for failure to deliver according to the specifications of the IO. However, those remedies are not defined as exclusive remedies in the standard terms and conditions, so if the Company was in breach of the IO terms and conditions, the advertiser could seek additional remedies. For example, the advertiser may refuse to pay the contractually stated price in the IO for the delivered impressions. The Company may also lose the business of that advertiser.

93.    After the close of trading on August 5, 2014, Defendants caused Rocket Fuel to announce the lowering of its full year revenue guidance, now anticipating revenue of $403 to $427 for 2014, instead of the previously reported $420 to $435 million.

94.    On August 5, 2014, The *Wall Street Journal* reported that "Rocket Fuel Inc. lowered its full-year revenue guidance for the year pointing to **customer concerns about inventory quality**. . . ." (Emphasis added).

95.    That same day, Defendants caused Rocket Fuel to hold a conference call. On the call, Defendant John conceded and characterizing bot fraud was as industry "phenomena" that had not been "well-understood." Defendant John stated that the Company was "surprised by the strength of trends impacting out bookings in June, and we now feel our full-year guidance should take into account slightly lower sales productivity based on . . . bot traffic and low-quality ad space on digital exchanges."

96.    On August 6, 2014, Rocket Fuel shares fell 30%, from $24.75 to $17.05.  Analysts became skeptical that the Company had been caught by surprise by the impact of bot traffic on Rocket Fuel's operations, financial performance, and outlook. In response, Defendant John referred to bot traffic as a "new thing" and:

> [F]rom the customer perspectives, it's I think a phenomena in our industry that hasn't been well understood I think by a lot of advertisers. I think agencies have understood, but maybe hadn't really filtered all the way down to advertisers yet. So it's going through a brief period of time here where it's the **new thing** to be confused about and try to understand. **But you're right**, ultimately, that it's only a piece of a puzzle and if you're still able to generate better ROI [return on investment], **you would think you would only do that if you weren't (technical difficulty) robots since they don't buy things**.

(Emphasis added).

97.    On August 11, 2014, at the Pacific Crest Global Technology Leadership Forum, Defendant Frankel mischaracterized bot traffic, calling it "a very short-term situation." Defendant Frankel stated,

> Yes. **Bots and fraud on the Internet are a very short-term situation.** It's not a problem that is unique to Rocket Fuel; far from it. It's affecting the entire industry.
>
> And so we've actually invested quite a bit at Rocket Fuel to weed out robot impressions so that we only actually show our clients' ads to actual human beings. Not everyone in the industry has invested as much as we have, and **some of our technology, actually, is especially well suited to identifying nonhuman behavior squelching it**.
>
> **But like I said, I think this is a relatively short-term situation.**  We've been through a few cycles in this way already in digital.  Search went through a phase of there being a lot of worry, and the big search players figured out how to

effectively combat the fraud that was going on in their sector.  And then folks stopped talking about it and went on to the next problem.  I think that's what we are going to see here.

**So I see it as a short-term issue.** There will always be bad actors who are looking to take advantage of marketplaces, but as the marketplace matures and grows up, we are going to have a fairly consistent response to it. And I think the marketers will get comfortable. Fundamentally -- the fundamentals of marketplaces are going to drive -- are going to keep driving growth in this sector, and fundamentals of marketplaces are really, really simple.

Rocket Fuel is a marketplace actor, and the marketplace is multiple buyers for each seller. So the sellers like that; the buyers like that; the marketers who get the value out of it like that. So that
marketplace dynamic is very, very hard to stop. And companies like Rocket Fuel are investing in making sure that the bad actors are kept to a minimum so that the good actors -- and that's most of the folks in the space -- can have their businesses.

(Emphasis added).

98.     On August 15, 2014, Defendants caused Rocket Fuel to issue a press release that contradicted Defendants John and Frankel, stating that "[a]dvertising fraud is not a new problem" and that "Rocket Fuel has addressed [it] for years."  The press release also stated, "[a]ccording to the Interactive Advertising Bureau, advertising fraud could cost advertisers $11 billion dollars alone this year and 25-50% of digital spend could be wasted on ads that are never viewed by humans."

99.     While publicly touting Rocket Fuel's prospects and performance throughout the Relevant Period, Defendants were reckless in not knowing or ignoring the fact that its current financial performance and forecasts were being harmed by the failure to disclose the truth about the ubiquity of bot traffic and the true extent of their inability to combat it. Rather than disclose the depth and pervasiveness of the Company's bot traffic challenges to the public, Defendants provided aggressive full year 2014 guidance in the fourth quarter of 2013 and the first quarter of 2014, and throughout the second quarter of 2014, only to revise that full year 2014 guidance a short time later with the release of the Company's second quarter financials of 2014.

100.    On August 14, 2014, Defendants caused Rocket Fuel to file its Form 10-Q with the SEC for the second quarter of 2014 ending June 30, 2014 (the "2Q14 10-Q"). The 2Q14 10-Q was the first time Rocket Fuel warned investors what it had known all along – that if served advertisers' advertisements on undesirable websites or failed to detect fraud "including bot traffic," Rocket Fuel's reputation and business operations would suffer.

101.    Finally underscoring the severity of the ad fraud issue, on August 15, 2014, Defendants caused the Company to issue a press release entitled *Media Alert: Rocket Fuel Expert Shares Best Practices to Combat Digital Advertising Fraud With the BBC*, in which it finally warned investors that: "[a]ccording to the Interactive Advertising Bureau, advertising fraud could cost advertisers $11 billion dollars alone this year and 25-50% of digital spend could be wasted on ads that are never viewed by humans."

102.    The statements referenced above were materially false and/or misleading and/or failed because Defendants knew or were reckless in not knowing that to disclose that: (a) the Company's inability to adequately detect and eliminate digital ad fraud, including bot traffic, was already having an adverse effect on the Company's operations and financial performance; (b) that attempting to traffic 500 billion ad impressions per month made it a virtual certainty that the Company would fail to detect ad fraud at levels acceptable to its customers; (c) a significant percentage of the ads the Company brokered were being "viewed" by automated fraudulent computer programs, rather than real people; and (d) the Company's revenue growth was negatively impacted due to customers deciding to opt out of utilizing the Company's services and bringing similar services in-house. In addition, Defendants failed to disclose information about the impact of bot traffic in a manner that would have warned investors that the Company's current and future financial performance was in jeopardy. While Rocket Fuel's stock was trading at artificially inflated levels, Defendants failed to correct these materially false and misleading statements.

## DAMAGES TO ROCKET FUEL

103.    As a direct and proximate result of Defendants' conduct, Rocket Fuel has expended and will continue to expend significant sums of money.

104. Such expenditures include, but are not limited to, legal fees associated with the class action lawsuit filed against the Company and certain Individual Defendants for violations of the federal securities laws, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations.

105. Such costs include, but are not limited to, compensation and benefits paid to Defendants who breached their fiduciary duties to the Company, and profits earned by Defendants from sales of Company stock based on material non-public information.

106. As a direct and proximate result of Defendants' conduct, Rocket Fuel has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future and that will plague its reputation in the eyes of the Company's customers due to the misrepresentations made by Defendants and caused to be made by the Company by Defendants.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

107. Plaintiff brings this action derivatively and for the benefit of Rocket Fuel to redress injuries suffered, and to be suffered, as a result of Defendants' breaches of their fiduciary duties as directors and/or officers of Rocket Fuel, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

108. Rocket Fuel is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

109. Plaintiff is, and at all relevant times has been, a Rocket Fuel shareholder. Plaintiff will adequately and fairly represent the interests of Rocket Fuel in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

110. A pre-suit demand on the Board of Rocket Fuel is futile and, therefore, excused. At the time of filing of this action, the Board consisted of the following eight Individual Defendants: Wootton, Zweben, Frankel, Ericson, Bostrom, Codd, Gardner, and Kokich (collectively, the "Directors"). All but Wootton are named as defendants in the securities fraud class action pending before this Court. Plaintiff need, however, only to allege demand futility as

to four of these eight directors that were on the Board at the time this action was commenced. Accordingly demand would have been futile and a useless act.

111.    The Demand Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

112.    The Demand Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

113.    Each of the Demand Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

114.    Each of the Demand Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

115.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, John is unable to comply with his fiduciary duties and prosecute this action. He is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

116.    Further, Defendants Ericson, Gardner, John, Frankel, and Zweben sold Company stock under highly suspicious circumstances. Defendants John and Frankel, as executive directors, possessed material (non-public) information and used that information to benefit themselves. Defendants Ericson, Gardner, and Zweben, as directors, possessed material

(nonpublic) information and used that information to benefit themselves. These defendants sold stock based on this knowledge of material (nonpublic) information regarding the severe prevalence of bot traffic in online advertising, the Company's inability to block or track fraudulent traffic, the impending loss of customers, and the impending decrease in the value of their holdings of Rocket Fuel. Accordingly, Defendants Ericson, Gardner, John, Frankel, and Zweben face a substantial likelihood of liability for breach of their fiduciary duty of loyalty. Any demand upon these defendants is futile.

117.   Wootton is CEO and Chairman, and thus, is a non-independent director. Defendant Wootton is paid an annual base salary of $430,000, is eligible for a bonus of 100% his base salary under an executive incentive compensation plan and a grant of stock option to purchase 500,000 shares of stock.  As leader of the Company responsible for fraud in the making of false and misleading statements of material fact as alleged herein, Wootton is not disinterested and is certainly not independent.  He is beholden to the Company's Board, the majority of which is liable for fraud and breach of fiduciary duties, and which is thus not disinterested, and which exert their controlling ownership over the Company.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the company, Wootton knowingly failed to disclose the fraud or recklessly turned a blind eye to it.  Defendant Wootton is thus not disinterested or independent, faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

118.   Defendant Zweben is Executive Chairman of the Company and the Board, and thus, is a non-independent director.  Zweben received from the Company, for interim services as chief executive in 2015, two bonus payments of $200,000 as well as stock options.  For his services as a member of the Board of the Company, Zweben also earned compensation of $179,993 in fees and stock awards for the year ended December 31, 2014.  He is beholden to the Company's Board, the majority of which is liable for fraud and breach of fiduciary duties, and which is thus not disinterested, and which exert their controlling ownership over the Company. In the Secondary Offering, Defendant Zweben sold 12,996 shares of personally held Company stock for proceeds of $757,081.  As Executive Chairman of the Company, Defendant Zweben

breached his fiduciary duties.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Zweben knowingly engaged in, facilitated, concealed, and failed to disclose that the fraud, or recklessly turned a blind eye to it.  Zweben is additionally named as defendant in the federal securities class action lawsuit.  Defendant Zweben is thus not disinterested or independent, faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

119.    Defendant Frankel is President of Rocket Fuel and a director, and thus, is a non-independent director.  Defendant Frankel's annual compensation (including salary and stock awards) was $2,923,397 for 2014, and $1,498,988 for 2013.  Defendant Frankel beneficially owns 2,655,232 shares or 6.27% of the Company's outstanding stock; he thus has an interest in keeping the Company's stock price as high as possible.  He is beholden to the Company's Board, the majority of which is liable for fraud and breach of fiduciary duties, and which is thus not disinterested, and which exert their controlling ownership over the Company.  Frankel sold 254,323 shares during the Secondary Offering at artificially inflated prices for a windfall of $14.8 million. As President of the Company, Defendant Frankel breached his fiduciary duties.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Frankel knowingly engaged in, facilitated, concealed, and failed to disclose that the fraud, or recklessly turned a blind eye to it.  Moreover, Frankel made many of the materially false and misleading statements alleged herein.  Frankel is additionally named as defendant in the federal securities class action lawsuit.  Defendant Frankel is thus not disinterested or independent, faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

120.    Defendant Ericson has served as a director of Rocket Fuel since May 2008. Defendant Ericson also serves on its compensation and nominating and governance committee. For his board services to the Company, Ericson also earned compensation of $185,993 in fees and stock awards for the year ended December 31, 2014.  Ericson beneficially owns 9,310,756 shares, or 22.09% of the Company's outstanding stock, while Ericson's venture capital firm beneficially owns 9,295,955 shares, or 22.05%; he thus has an interest in keeping the Company's stock price as high as possible.  In the Secondary Offering, Defendant Ericson sold 1,656,776 personally held

shares of stock for an eye-popping $101,063,336 in proceeds and caused his venture capital firm to engage in duplicate transaction. As a Company director, Defendant Ericson breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Ericson knowingly engaged in, facilitated, concealed, and failed to disclose that the fraud, or recklessly turned a blind eye to it. Ericson is additionally named as defendant in the federal securities class action lawsuit. Defendant Ericson is thus not disinterested or independent, faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

121. Defendant Gardner has served as a director since July 2011. He is also a member of the audit committee. Defendant Gardner earned compensation of $182,493 in fees and stock awards for the year ended December 31, 2014. Defendant Gardner beneficially owns 2,082,316 shares, or 4.94% of the Company's outstanding stock; he thus has an interest in keeping the Company's stock price as high as possible. During the Secondary Offering, Gardner sold 407,693 shares of Company stock for $23,750,155 in proceeds. As a Company director, Defendant Gardner breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Gardner knowingly engaged in, facilitated, concealed, and failed to disclose that the fraud, or recklessly turned a blind eye to it. Gardner is additionally named as defendant in the federal securities class action lawsuit. Defendant Gardner is thus not disinterested or independent, faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

122. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Indeed, each of them, but Defendant Wootton is a defendant in the securities fraud class action.

123. Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other. The Board is

especially beholden to Defendants Ericson, Gardner, and Frankel, who together own one third of the entire Company, and who actively exert their control over the Board and the Company.

124.   Members of the Board have longstanding business and personal relationships with each other and Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.   These conflicts of interest precluded the Board from adequately monitoring the Company's operations and calling into question Defendants' conduct.   Thus, any demand on these Directors would be futile.

125.   Rocket Fuel has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Rocket Fuel any part of the damages Rocket Fuel suffered and will continue to suffer thereby.   Thus, any demand on these Directors would be futile.

126.   Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.   Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).   As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.   Accordingly, demand is excused as being futile.

127.   The acts complained of herein constitute violations of fiduciary duties owed by Rocket Fuel's officers and directors and these acts are incapable of ratification.

128.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Rocket Fuel.   If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-

versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Rocket Fuel, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

129.    If there is no directors' and officers' liability insurance, then the Directors will not cause Rocket Fuel to sue Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

130.    Thus, for the reasons set forth above, all of the Directors, and, if not all of them, certainly a majority of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

131.    Overall, the Company will most likely expend millions of dollars in internal investigations and defending the securities fraud class action.  It may be liable for millions of dollars in damages if it loses or settles the related securities fraud class action. Moreover, the Company's reputation has been severely damaged in both the eyes of investors and customers. The Company has also wasted a substantial amount of money in compensating Defendants as directors and officers.  Its market capitalization has been severely diminished and its prospect of raising equity in the future is questionable. All of this substantial damage stems proximately from Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

132.    Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct and caused Rocket Fuel to conceal the true facts as alleged herein.

133.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise  Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning Rocket Fuel's operations, financial condition, future business prospects,

internal controls, and bonuses provided to employees; and (iii) to artificially inflate Rocket Fuel's stock price.

134.   Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently to conceal material facts, misrepresent its financial results, fail to correct such misrepresentations, engage in insiders sales on material non-public information, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each Defendants who is a director of Rocket Fuel was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

135.   Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing.

136.   At all times relevant hereto, each Defendant was the agent of each other and of Rocket Fuel, and was at all times acting within the course and scope of such agency.

### FIRST COUNT
**Against Defendants for Breach of Fiduciary Duties**

137.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138.   Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Rocket Fuel's business and affairs.

139.   Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

140.   Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Rocket Fuel.

141.    In breach of their fiduciary duties owed to Rocket Fuel, Defendants willfully engaged in misconduct, including selling Company stock based on material non-public information, and participated in misrepresentation of the Company's business operations and prospects and failed to correct the Company's public statements, rendering them personally liable to the Company for breaching their fiduciary duties.

142.    Defendants had actual or constructive knowledge that they had engaged in misconduct and caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were made, and were subsequently not corrected, knowingly or recklessly and for the purpose and effect of artificially inflating the price of Rocket Fuel's securities.

143.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

144.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them, and failed to correct such misrepresentations and omissions.   Such material misrepresentations and/or omissions were caused to be made knowingly or recklessly. Such failure to correct the material misrepresentations and/or omissions was caused to be done knowingly or recklessly.

145.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Rocket Fuel has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

## SECOND COUNT
### Against Defendants for Abuse of Control

146.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Rocket Fuel, for which they are legally responsible.

148.     As a direct and proximate result of Defendants' abuse of control, Rocket Fuel has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Rocket Fuel has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

### THIRD COUNT
**Against Defendants for Gross Mismanagement**

149.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.     By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Rocket Fuel in a manner consistent with the operations of a publicly-held corporation.

151.     As a direct and proximate result of  Defendants' gross mismanagement and breaches of duty alleged herein, Rocket Fuel has sustained and will continue to sustain significant damages.

152.     As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

153.     Plaintiff, on behalf of Rocket Fuel, has no adequate remedy at law.

### FOURTH COUNT
**Against Defendants for Unjust Enrichment**

154.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.     By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, Rocket Fuel.

156.    Defendants either received bonuses, stock options, or similar compensation from Rocket Fuel that was tied to the financial performance or artificially inflated valuation of Rocket Fuel or received compensation that was unjust in light of Defendants' bad faith conduct.

157.    Plaintiff, as a shareholder and a representative of Rocket Fuel, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation and any profits made from sales of Company stock made on material non-public information, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Rocket Fuel, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Rocket Fuel;

(c)    Determining and awarding to Rocket Fuel the damages sustained by it as a result of the violations set forth above from each of Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Rocket Fuel and Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Rocket Fuel and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Rocket Fuel to nominate at

least four candidates for election to the Board; and

       3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Rocket Fuel restitution from Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 21, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## VERIFICATION

I, Hugues Gervat, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __19__ day of January, 2016

_____
Huges Gervat